UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PATRICIA EPOLITO,

               Plaintiff,

vs.                              Case No.  3:09-cv-334-J-34MCR

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

               Defendant.

_____/

# **O R D E R**

**THIS CAUSE** is before the Court on Plaintiff's Dispositive Motion for Summary Judgment with Incorporated Statement of Undisputed Facts and Memorandum of Law in Support (Doc. No. 25; Epolito's Motion) filed on December 11, 2009.  On February 8, 2010, Defendant The Prudential Insurance Company of America (Prudential) filed a response in opposition to Epolito's Motion.  <u>See</u> Defendant's Response in Opposition to Plaintiff's Dispositive Motion for Summary Judgment (Doc. No. 36; Prudential's Response).  In addition, Prudential filed a cross-motion for summary judgment on December 11, 2009, <u>see</u> Defendant/Counterclaimant's Motion for Summary Judgment and Memorandum of Law in Support (Doc. No. 26; Prudential's Motion), and Plaintiff Patricia Epolito (Epolito) filed her response in opposition to Prudential's Motion on February 8, 2010, <u>see</u> Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 37; Epolito's Response).  With Court permission, Prudential filed a reply to Epolito's Response on March 8, 2010.  <u>See</u> Defendant's Reply Brief in Further Support of Its Motion

for Summary Judgment (Doc. No. 40; Prudential's Reply).  Accordingly, the Motions before the Court are ripe for review.

## I.    Background Facts

Kemper Auto & Home, the personal lines property and casualty insurance business of the Kemper Insurance Companies, an affiliate of Lumbermens Mutual Casualty Company (Lumbermens), hired Patricia Epolito on February 7, 1977.  See Prudential's Motion, Ex 1: Administrative Record (A.R.) at 179-81; 347, 492, 574.  As an employee, Epolito was eligible for and enrolled in a pension plan named the Kemper Retirement Plan.  See Affidavit of Patricia Epolito[1] (Doc. No. 24; Epolito Affidavit) ¶ 3.  On June 28, 2002, Unitrin, Inc. (Unitrin) acquired Kemper Auto & Home through an asset purchase agreement.  A.R. at 492, 574. As a result, Epolito received a copy of Unitrin's new employee manual on December 13, 2002, which included a letter stating: "[w]elcome to Unitrin's Kemper Auto and Home Group. Employees of Unitrin's Kemper Auto and Home Group are employed by Kemper Independence Insurance Company, which is a wholly owned subsidiary of Unitrin, Inc." Epolito Affidavit ¶ 10; Id., Ex. C.  Epolito also received a letter from Unitrin, dated December 18, 2002, offering her a position with Kemper Independence Insurance Company, a Unitrin Company (Kemper Independence/Unitrin).  Id. ¶ 19; Id., Ex. D.  In addition, the letter requested that Epolito sign an Agreement and Release form consenting to the transfer of her employment record to her "new employer."  Id., Ex. D.  Upon acceptance of this offer, the letter informed Epolito that her effective date of employment would be January 1, 2003.  Id.

---

[1]      The Court notes that the Epolito Affidavit and Exhibits, although not scanned into the administrative record, were submitted to Prudential as part of Epolito's administrative appeal.  See A.R. at 574-77; Affidavit of John Tucker (Doc. No. 28) ¶ 4, filed December 21, 2009.

Thereafter, Epolito enrolled in an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1381, and funded through an insurance policy issued by Prudential.  Unitrin, Inc. is the Plan's Contract Holder and "all full-time non-commissioned employees of Kemper Auto and Home Insurance Company" constitute the Covered Class.  A.R. at 4.  On February 3, 2003, Epolito stopped working due to health complications caused by Graves' Disease.  Id. at 76, 347.  She filed a claim for long term disability (LTD) benefits under the Plan and was initially approved to receive benefits in the amount of $3,891.87 per month, effective August 2, 2003.  Id. at 62. Near the end of December 2003, Epolito decided to begin withdrawing her pension benefits from the Kemper Retirement Plan as well.  See Epolito Affidavit ¶ 22.[2]  Thus, on February 1, 2004, Epolito started receiving pension benefits in the amount of $1,864.42 per month. Id., Ex. F.  In addition, on December 11, 2003, Epolito filed an application with the Social Security Administration (SSA) for social security disability (SSD) benefits in connection with the disabling effects of her Graves' Disease and depression.  A.R. at 513.  Pursuant to Prudential's request, Epolito signed a Reimbursement Agreement in which she acknowledged that Prudential was entitled to reduce her LTD benefits by the amount she received for her disability under the Social Security Act.  See id. at 65, 227.  As part of that Agreement, Prudential agreed to "postpone making the reduction of benefits" described above, in return for Epolito's promise to reimburse Prudential for the payments made to her

---

[2]     Although the Epolito Affidavit states that Epolito first decided to begin taking her pension in December 2004, see Epolito Affidavit ¶ 22, the Court determines that this is a typographical error, given that Epolito began receiving the pension benefits in February 2004, see id., Ex. F., and in Epolito's Motion as well as her administrative appeal she states that she decided to begin receiving her pension benefits in December 2003, see Epolito's Motion at 5; A.R. at 575.

in excess of the amount to which she would have been entitled under the terms of the Plan, "if any benefits under the Social Security Act are awarded retroactively." Id. at 227. Although her SSD benefits claim was denied initially and upon reconsideration, ultimately, an Administrative Law Judge approved her claim on November 7, 2006. Id. at 510-19. As a result, Epolito began receiving SSD benefits, including a retroactive award of benefits dating back to July 2003. Id. at 562; 565. The initial amount of her monthly benefit payment was $1,687.20. Id.

On July 26, 2005, Prudential advised Epolito that her LTD benefits would be terminated as of August 1, 2005, because she no longer met the definition of "Total Disability" under the Plan.[3] Id. at 66. After unsuccessfully administratively appealing this determination, Epolito brought a lawsuit challenging Prudential's decision on July 10, 2006. See generally Epolito v. Prudential Ins. Co. of Am. (Epolito I), 523 F. Supp. 2d 1329 (M.D. Fla. 2007). In Epolito I, the Court determined that Prudential's "decision to deny [Epolito] LTD benefits was both wrong and unreasonable," and directed that Epolito be awarded past due benefits from the benefit termination date. Id. at 1344. The case was then remanded to Prudential for a calculation of Epolito's LTD benefits. Id.

On remand, Prudential determined that under the terms of the Plan it was entitled to offset the amount of Epolito's LTD benefits by the amount she was receiving in pension and SSD benefits.[4] A.R. at 467-68. In reaching this conclusion, Prudential relied on a provision

---

[3]        Prudential paid benefits through August 31, 2005, "as a measure of assistance" to Epolito. A.R. at 67.

[4]        The parties agree that Prudential is entitled to reduce Epolito's LTD benefit payments by the amount she receives in SSD benefits. See Epolito's Motion at 2 n.2, 11.

in the Plan which provides: "Prudential will deduct from your gross disability payment the following deductible sources of income: . . . The amount that you: . . . (b) voluntarily elect to receive as retirement or early retirement payments under your Employer's retirement plan." Id. at 17-18.  The Plan defines the term "Employer" to mean "the Contract Holder, and includes any division, subsidiary or affiliate who is reported to Prudential in writing for inclusion under the Group Contract, provided that Prudential has approved such a request." Id. at 34.  Additionally, "Contract holder" is defined as "the Employer to whom the Group Contract is issued," id. at 33, and Unitrin, Inc. is specified as the Contract Holder, id. at 4. Because it had not previously offset Epolito's LTD benefits by the amount she was receiving in pension benefits, Prudential concluded that it had overpaid Epolito's LTD benefits for the period spanning from August 2, 2003 to August 31, 2005.  Id. at 487.  In addition, because Epolito received a retroactive award of SSD benefits, Prudential found that it had overpaid Epolito's LTD benefits on that basis as well.  Id.  According to the Plan,

> Prudential has the right to recover any overpayments due to: fraud; any error Prudential makes in processing a claim; and your receipt of deductible sources of income.  You must reimburse us in full.  We will determine the method by which the repayment is to be made.  Prudential will not recover more money than the amount we paid you.

Id. at 28.  As such, Prudential instructed Epolito to fully reimburse Prudential in the amount of $87,849.79 to account for the pension and SSD benefits that Prudential had not previously offset.  See id. at 471.  Due to this "gross overpayment," Prudential applied the net retroactive LTD benefit award due Epolito, pursuant to Epolito I, to the overpayment.  Id. at 487.  Prudential also began applying Epolito's net monthly LTD benefit payments to the

balance of the overpayment, such that Epolito's benefit statements reflected a $0 benefit. Id. at 487, 581, 582.

In response to Prudential's offset calculations, Epolito conceded that her LTD benefits must be offset by her SSD benefits, but argued that applying an offset due to her pension benefits was improper because her pension benefits were from a former employer.  Id. at 573.  The Plan states that "Prudential will not deduct from your gross disability payment income you receive from . . . a retirement plan from another Employer." Id. at 19.  Thus, based on this provision, Epolito contended that her pension benefits were not deductible. Id. at 573.  Although Epolito pursued an administrative appeal on that basis, see id. at 568-76, 580, Prudential upheld its determination that her pension was being paid by her "Employer," not another Employer, and thus, an offset for the pension benefits was appropriate under the Plan.  See id. at 496-501.  In its administrative appeal decision, Prudential explained:

> [a]s Ms. Epolito accrued her pension benefits while working for Kemper Auto and Home Group, draws her pension benefits under Kemper Auto and Home Group's pension plan, and receives long term disability benefits under the booklet certificate covering only employees of the Unitrin subsidiary Kemper Auto and Home Insurance Company, we uphold our decision to deduct Ms. Epolito's monthly pension retirement benefit from her monthly LTD benefit.

See A.R. at 500-01.  To challenge this determination, Epolito filed the instant Complaint (Doc. No. 1) on April 13, 2009.  See generally Complaint.  Thereafter, Prudential brought a counterclaim for restitution seeking to recover the overpaid LTD benefits, resulting from Epolito's unaccounted for receipt of SSD and pension benefits.  See Defendant The Prudential Insurance Company of America's Answer, Affirmative Defenses and Counterclaim to Plaintiff's Complaint (Doc. No. 9; Answer) at 10-15 (Counterclaim).

II.     **ERISA Benefits Claim**

A.      **Summary of the Arguments**

In Epolito's Motion, Epolito argues that Prudential improperly applied an offset to her LTD benefits based on her receipt of the pension benefits.  Epolito argues that she is receiving the pension benefits from her former employer, Kemper Insurance Companies, not her current employer Kemper Independence/Unitrin.  Epolito's Motion at 11.  Because the Plan does not allow for the offset of pension benefits received from a former employer, Epolito maintains that Prudential is improperly deducting the amount of her pension benefits from her LTD benefits. Id.  Alternatively, Epolito argues that the Plan language is ambiguous and must be construed in her favor.  See id. at 12.  In addition, Epolito contends that Prudential's decision with respect to her pension benefits was not only de novo wrong, but that its determination was arbitrary and capricious. Id. at 14-15.  Asserting that Prudential was operating under a conflict of interest in making its determination, Epolito argues that "[n]o reasonable person could agree that [Kemper Independence/Unitrin] is the same entity as [Kemper Insurance Companies]," and concludes that, as such, Prudential abused its discretion in making its offset determination. Id. at 15.

In Prudential's Response, Prudential maintains that its determination that Unitrin's purchase of the Kemper Auto & Home Group from Kemper Insurance Companies "does not change who [Epolito] was employed by for purposes of coverage under the [Plan]" is reasonable.  See Prudential's Response at 4.  Prudential argues that the definition of Employer under the Plan includes  any division, subsidiary, or affiliate of Unitrin, and thus Kemper Auto & Home, as a division and subsidiary of Unitrin, is encompassed by this

definition.   In support of its decision, Prudential asserts that after Unitrin's purchase of Kemper Auto & Home, Kemper Auto & Home's corporate headquarters did not change, its president did not change, and it continued to operate as "Kemper Auto and Home."  See Prudential's Response at 5-6.   In addition, Prudential argues that Epolito has waived, or should be estopped from making, the argument that she receives her pension benefit from a former employer.  Id. at 6-8.  Prudential maintains that Epolito represented herself to be an employee of Kemper Auto & Home for over 25 years and that Epolito's employer represented to Prudential that it hired Epolito on February 7, 1977.  See id. at 6-7. Additionally, Prudential cites to the employment history submitted by Epolito to Prudential where she did not indicate "a change of employer in January 2003 or at any other time since 1983."  Id. at 7.  Finally, Prudential argues that the reasonableness of its decision is not undermined by any "purported conflict of interest" because Epolito failed to "present any argument or point to any evidence as to the actual impact of the purported conflict of interest on the claim determination."  See id. at 9.

### B.    Applicable Summary Judgment Standard

Under Rule 56(c), Federal Rules of Civil Procedure (Rule(s)), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c). However, "'[i]n an ERISA benefit denial case . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court.   It does not take evidence, but rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary.'"

Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005)[5] (per curiam) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)). Accordingly, where an administrator's decision is reviewed for abuse of discretion, "'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exist, do not apply.'" Crume v. Metro. Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999), abrogated on other grounds by Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (9th Cir. 2006) (en banc)); Disanto v. Wells Fargo & Co., No. 8:05-CV-1031-T-27MSS, 2007 WL 2460732, at *4 (M.D. Fla. Aug. 24, 2007); Menard v. Hartford Life & Accident Ins. Co., No. 6:05-cv-1145-Orl-31DAB, 2006 WL 3091527, at *4 (M.D. Fla. Oct. 30, 2006); Providence v. Hartford Life & Acc. Ins. Co., 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla. 2005).  Indeed,

> where the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal" summary judgment rules can sensibly apply.  After all, the pertinent question is not whether the claimant is truly [correct], but whether there is a reasonable basis in the record to support the administrator's decision on [the point in contention].

Crume, 417 F. Supp. 2d at 1273 (alterations added).  Thus, the Court will review this case using the modified Rule 56 standard set forth in Curran and Crume.  See Curran, 2005 WL 894840, at *7, Crume, 417 F. Supp. 2d at 1272-73; see also Ganceres v. Cingular Wireless Health & Welfare Benefits Plan for Non-Bargained Emps., No. 3:04-cv-199-J-32HTS, 2006 WL 2644919, at *6-7 (M.D. Fla. Sept. 14, 2006).

---

[5]      "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam).

**C.      Standard of Review Applicable to ERISA Benefit Determinations**

Under 29 U.S.C. § 1132(a)(1)(B), a person may bring a civil action "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). Although ERISA does not provide a standard of review for actions challenging benefit determinations, see Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1449 (11th Cir. 1997), the Supreme Court established a framework for a proper analysis in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). In Firestone, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." See Firestone, 489 U.S. at 115. Following the Supreme Court's holding in Firestone, the Eleventh Circuit set forth "a six-step process 'for use in judicially reviewing virtually all ERISA-plan benefit denials,'" referred to as the Williams methodology:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is 'de novo wrong,' then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is 'de novo wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

White v. Coca-Cola Co., 542 F.3d 848, 853-54 (11th Cir. 2008) (quoting Williams v. BellSouth Telecomm., Inc., 373 F.3d 1132, 1137-38 (11th Cir. 2004)).

However, in Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343 (2008) the Supreme Court "implicitly overrule[d] [Eleventh Circuit] precedent to the extent it require[d] district courts to review benefit determinations by a conflicted administrator under the heightened standard."  Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008); see also White, 542 F.3d at 854.  In Glenn, the Supreme Court addressed how a court should consider a plan administrator's conflict of interest when reviewing a discretionary benefit determination.  See Glenn, 128 S. Ct. at 2350.  The Court instructed that the presence of a conflict of interest does not require "a change in the standard of review, say, from deferential to de novo review."  Id.  Indeed, the Court stated that it did not "believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict."  Id. at 2351.  Instead, the Court explained that "conflicts are but one factor among many that a reviewing judge must take into account."  Id.

In light of the Glenn decision, the Eleventh Circuit held, in Doyle, that "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious."  Doyle, 542 F.3d at 1360.  Additionally, "while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary

-11-

and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Id. Thus, following Glenn and Doyle, the Williams methodology remains intact, except for the sixth step. See Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1196 (11th Cir. 2010). Accordingly, this Court will apply the modified Williams methodology in its review of Prudential's interpretation of the LTD Plan.

### D.    Discussion

#### 1.    De Novo Review

At the outset, the Court notes that it is Epolito's burden to establish her entitlement to the contractual benefits she seeks. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) (per curiam). The first step of the Williams methodology requires the Court to determine whether Prudential's interpretation of the LTD Plan is de novo wrong. "A decision is 'wrong' if, after de novo review, 'the court disagrees with the administrator's decision.'" Capone, 592 F.3d at 1196 (quoting Williams, 373 F.3d at 1138). The Eleventh Circuit instructs that "[w]hen ERISA governs, federal substantive law developed in this area of contract law controls." Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1333 (11th Cir. 1995). However, ERISA provides no principles of contract interpretation or construction. See Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179, 1183 (11th Cir. 2004) (acknowledging that "[a]lthough comprehensive in many respects, ERISA is silent on matters of contract interpretation"); First Capital Life Ins. Co. v. AAA Commc'ns, Inc., 906 F. Supp. 1546, 1557 (N.D. Ga. 1995). Yet, the Court is not left without guidance because "[c]ourts have the authority 'to develop a body of federal common law to govern

issues in ERISA actions not covered by the act itself.'" <u>Horton</u>, 141 F.3d at 1041 (quoting

<u>Kane v. Aetna Life Ins.</u>, 893 F.2d 1283, 1285 (11th Cir. 1990)); <u>Hauser</u>, 56 F.3d at 1333;

<u>Harrison v. Aetna Life Ins. Co.</u>, 925 F. Supp. 744, 747 (M.D. Fla. 1996).

In creating this "body of common law, federal courts may look to state law as a model

because of the states' greater experience in interpreting insurance contracts and resolving

coverage disputes." <u>Horton</u>, 141 F.3d at 1041.  When deciding whether to adopt a certain

rule as part of the federal common law, the "court[] must examine whether the rule, if

adopted, would further ERISA's scheme and goals." <u>Id.</u>; <u>see also</u> <u>Dixon</u>, 389 F.3d at 1183.

The two central goals of ERISA are  "protection of the interests of employees and their

beneficiaries in employee benefit plans and . . . uniformity in the administration of employee

benefit plans." <u>Horton</u>, 141 F.3d at 1041 (citations omitted).  In addition, the court will not

construe a particular principle as part of the federal common law when doing so would:  "'1)

conflict with the statutory provisions of ERISA; 2) discourage employers from implementing

plans governed by ERISA; or 3) threaten to override the explicit terms of an established

ERISA benefit plan.'" <u>First Capital Life Ins. Co.</u>, 906 F. Supp. at 1557 (quoting <u>Phoenix Mut.</u>

<u>Life Ins. Co. v. Adams</u>, 30 F.3d 554, 563 n.21 (4th Cir. 1994)).

In light of the foregoing, the Court considers what rules of construction should be

applied to interpret the plan at issue.  In <u>Dahl-Eimers v. Mutual of Omaha Life Insurance Co.</u>,

986 F.2d 1379 (11th Cir. 1993) the court set forth several rules of construction developed

under Florida law for interpreting insurance contracts.  <u>See</u> <u>Dahl-Eimers</u>, 986 F.2d at 1381-

82.  The rules are as follows:  (1) "first . . . assess the natural or plain meaning of the policy

language"; (2) "construe an insurance contract in its entirety, striving to give every provision

meaning and effect"; (3) "[a]n insurance contract is ambiguous if it is susceptible to two or more reasonable interpretations that can fairly be made"; (4) an "[a]mbiguity . . . may arise from silence"; (5) a court should not "rewrite contracts or add meaning to create an ambiguity"; and (6) an ambiguity is not necessarily present because the contract requires interpretation or fails to define a term. Id. at 1381-82.  In addition, in Miller v. Principal Mutual Life Insurance Co., 791 F. Supp. 858 (M.D. Fla. 1992) the court indicated that "[w]hen there is but one logical interpretation of a phrase, 'ambiguities will not be inserted, by using twisted and strained reasoning, into contracts where no such ambiguities exist.'" Miller, 791 F. Supp. at 861 (quoting Smith v. Horace Mann Ins. Co., 713 F.2d 674, 676 (11th Cir. 1983)).

The undersigned finds that these principles should be applied in this case to interpret the Plan.  These rules are consistent with and would further the goals of ERISA, especially in establishing uniformity of administration.  Moreover, application of these principles would not conflict with any statutory provision of ERISA, discourage implementation of the Plan, or override an explicit term of the Plan.  Indeed, courts have already recognized the application of these rules in ERISA cases.  See Potter v. Liberty Life Assurance Co. of Bos., 132 F. App'x 253, 258 (11th Cir. 2005) (finding that the administrator's decision was correct when it interpreted certain terms in the contract by considering the entire contract); Rapp v. Found. Health, No. 97-7065-CIV, 1999 WL 1457224, at *4-5 (S.D. Fla. Aug. 26, 1999) (applying the construction principles recognized in Dahl-Eimers); Vickers v. Guardian Life Ins. Co. of Am., 204 F. Supp. 2d 1326, 1332 (M.D. Fla. 2002) (citing Dahl-Eimers and finding that the language in a plan is ambiguous when it "is susceptible to differing interpretations");

First Capital Life Ins. Co., 906 F. Supp. at 1556.  In addition, the Eleventh Circuit has recognized that certain traditional principles of contract interpretation are applicable in ERISA cases.  See Jones v. Am. Gen. Life & Accident Ins. Co., 370 F.3d 1065, 1070 (11th Cir. 2004) (applying the principle of contra preferentem); Adams v. Thiokol Corp., 231 F.3d 837, 844 (11th Cir. 2000) (allowing the consideration of extrinsic evidence to resolve an ambiguity in a plan).  Therefore, the Court will apply these principles of contract construction to determine whether the administrator's interpretation of the Plan is wrong.

In addition to the foregoing rules, the Court will also apply the doctrine of contra proferentem, if appropriate, because the Eleventh Circuit has recognized that this doctrine is part of the federal common law in ERISA cases.  See White, 542 F.3d at 855; Jones, 370 F.3d at 1070; Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala., 41 F.3d 1476, 1481 (11th Cir. 1995); Lee v. Blue Cross/Blue Shield of Ala., 10 F.3d 1547, 1551 (11th Cir. 1994).  This doctrine directs that any ambiguity in an ERISA plan is to be construed against the drafter.  See, e.g., Lee, 10 F.3d at 1551.  Thus, if both the plaintiff and the administrator propose reasonable interpretations of the plan, which result in an ambiguity, then, pursuant to the doctrine of contra proferentem, the plan will be construed against the administrator and the administrator's interpretation will be deemed to be de novo wrong.  See id.; Florence Nightingale Nursing Serv., Inc., 41 F.3d at 1481; Vickers, 204 F. Supp. 2d at 1330; Mattive v. Healthsource of Savannah, Inc., 893 F. Supp. 1559, 1567 (S.D. Ga. 1995).

Epolito contends that Kemper Auto & Home, when it was a part of Kemper Insurance Companies, and an affiliate of Lumbermens, was a different "Employer" than the Kemper

Auto & Home that is now covered under the Plan.  As such, Epolito contends that a pension benefit accrued while Kemper Auto & Home was owned by Lumbermens is not a benefit under her "Employer's" retirement plan, because her "Employer" is the Kemper Auto & Home that is now owned by Unitrin, Inc.  The Plan defines Epolito's "Employer" as the Contract Holder, i.e., Unitrin, "and includes any division, subsidiary, or affiliate who is reported to Prudential in writing for inclusion under the Group Contract, provided that Prudential has approved such request."  See A.R. at 34, 1.  Thus, the plain meaning of "Employer" encompasses Unitrin and certain of its affiliates, not any entity that previously owned the assets of one of the affiliates.  Cf. Bedinghaus v. Modern Graphic Arts, 15 F.3d 1027, 1029-30 (11th Cir. 1994) (finding that the term "company" refers to the owner and its affiliates, and not to an entity that purchases the assets of an affiliate); Ulmer v. Harsco Corp., 884 F.2d 98, 103 (3d Cir. 1989) (finding a district court's attempt to distinguish between an "entity" and the managers who control it unconvincing) ("At the conceptual level, from the standpoint of an employee, the owners define the nature of the "entity" employees work for.").

This interpretation does not conflict with the other provisions of the Plan, nor would it render any of the other provisions meaningless.  Moreover, the distinction between Unitrin's Kemper Auto and Home and the Kemper Auto and Home that was affiliated with Lumbermens is supported by the facts of the case.  After the purchase, Unitrin sent Epolito a letter offering her employment with Unitrin's Kemper Auto and Home.  In addition, Epolito was required to sign a release authorizing Unitrin to access her employment records from Kemper Auto and Home.  Significantly, Unitrin is not responsible for the pension obligation, instead, the Pension Benefit Guaranty Corporation took control of the Kemper Retirement

Plan around January 2005. Thus, Epolito's pension benefit does not come from a retirement plan owned by Unitrin or a Unitrin subsidiary. Accordingly, the Court finds the plain and natural meaning of the term "Employer" under the facts of this case means Unitrin's Kemper Auto and Home, and does not include the Kemper Auto and Home that was previously affiliated with Lumbermens. However, even if the Court were to find that the term was merely ambiguous, because Epolito's interpretation of the LTD Plan is at least reasonable, under contra proferentem, the Court must accept Epolito's interpretation as correct. White, 542 F.3d at 855 (finding that because the claimants' interpretation was reasonable, the plan administrator's determination was de novo wrong); id. ("Ambiguities in ERISA plans are construed against the drafter of the document, and a claimant's reasonable interpretation is viewed as correct."); see also Mordecai v. Standard Ins. Co., 157 F. App'x 99, 101 (11th Cir. 2005) (per curiam). Because Lumbermens' Kemper Auto and Home is not within the definition of "Employer" under the Plan, Prudential's decision to offset the pension benefits accrued under Epolito's retirement plan with her former employer, i.e. the Kemper Auto and Home that was owned by Lumbermens, is de novo wrong.

### 2. Arbitrary and Capricious Review

The parties do not dispute that Prudential had discretionary authority to interpret the provisions of the LTD Plan. See Epolito's Motion at 14-15; Prudential's Motion at 8; A.R. at 43. Additionally, in Epolito I, the Court determined that Prudential "had a conflict of interest, as defined by the Eleventh Circuit, because it was responsible for paying claims, as well as deciding them." Epolito I, 523 F. Supp. 2d at 1332. In Glenn, the Supreme Court confirmed that where "a plan administrator both evaluates claims for benefits and pays benefits claims"

the administrator is acting under a "conflict of interest" that must be weighed as a factor in

determining whether there has been an abuse of discretion.  See Glenn, 128 S. Ct. at 2348-

50.  Thus, the Court must now review Prudential's "wrong" interpretation of the Plan under

the arbitrary and capricious standard, taking into account its conflict of interest.[6]  To do so,

the Court must consider whether Prudential's interpretation of the term "Employer" is

reasonable.  White, 542 F.3d at 856.  During this stage of the analysis, the contra

proferentem principle does not apply because "'the reasonable interpretation factor and the

arbitrary and capricious standard of review would have little meaning if ambiguous language

in an ERISA plan were construed against the [plan administrator].'"  White, 542 F.3d at 857

(quoting Cagle v. Bruner, 112 F.3d 1510, 1519 (11th Cir. 1997)).  Thus, "'[a]s long as a

reasonable basis appears for [the] decision [of the plan administrator], it must be upheld as

not being arbitrary or capricious, even if there is evidence that would support a contrary

---

[6]        In Epolito's Response, Epolito argues that the Supreme Court requires an administrator's decision to be "lawful, not simply reasonable."  See Epolito's Response at 2-3.  In support of this position, Epolito cites to language in Glenn stating that "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."  Glenn at 2351 (emphasis added).  Although unclear, Epolito appears to contend that the "deferential" standard of review applied in Glenn does not encompass the "arbitrary and capricious" or "abuse of discretion" standards used in the Eleventh Circuit.  See Epolito's Response at 1-2.  This argument is not well-taken.  In Doyle, the Eleventh Circuit discussed the impact of Glenn on the Williams methodology and approved the district court's use of the Williams methodology modifying only the sixth step with respect to the conflict of interest analysis.  Doyle, 542 F.3d at 1360; Capone, 592 F.3d at 1196.  Under the Williams methodology, a reviewing court must determine whether a plan administrator's discretionary decision was "reasonable," which the Eleventh Circuit explained as a review "under the more deferential arbitrary and capricious standard."  See Doyle, 542 F.3d at 1356 (quoting Williams, 373 F.3d at 1138); see also id. at 1356 n.1 ("Cases in our circuit equate the arbitrary and capricious standard with the abuse of discretion standard.  We use the terms interchangeably." (citation omitted)).  Indeed, in addressing the appropriate standard of review for ERISA cases, the Supreme Court recently reemphasized that a deferential standard of review "means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"  Conkright v. Frommert, 130 S.Ct. 1640, 1651 (2010) (quoting Firestone, 489 U.S. at 111).  Thus, the Court is not persuaded by Epolito's attempt to distinguish between a "lawful" interpretation and a "reasonable" one.  Indeed, based on the foregoing authority, an administrator's discretionary plan interpretation is lawful if it is reasonable, and it is reasonable if it is not an abuse of the administrator's discretion.  See White, 542 F.3d at 856; Eady v. Am. Cast Iron Pipe, 203 F. App'x 326, 328 (11th Cir. 2006) (per curiam).

decision.'" White, 542 F.3d at 856 (quoting Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989)).

In determining whether a plan administrator's decision is arbitrary and capricious, the Court is limited to deciding whether Prudential's interpretation of the Plan was made rationally and in good faith. Cagle, 112 F.3d at 1518; Blank v. Bethlehem Steel Corp., 926 F.2d 1090, 1093 (11th Cir. 1991). "Factors relevant to that determination include: (1) the uniformity of [Prudential's] construction; (2) the reasonableness of its interpretation; and (3) possible concerns with the way unexpected costs may affect the future financial health of [Prudential]." Cagle, 112 F.3d at 1518. Other factors may also be relevant, such as "the internal consistency of a plan, the relevant regulations formulated by administrative agencies, and the factual background of the determination, including any inferences of bad faith." Id. at 1518 n.6. Finally, because Prudential operates under a conflict of interest, the Court must consider this conflict as a factor in its determination. Doyle, 542 F.3d at 1360. After consideration of all the relevant factors, the Court concludes that Prudential's interpretation was not arbitrary and capricious.

Most persuasive among the factors in this case is that of the uniformity of Prudential's interpretation of the Plan language. A review of the record in this case, reveals that Prudential has consistently interpreted Epolito's "Employer" to be Kemper Auto & Home itself, regardless of what parent company owned that division. In approving Epolito's initial eligibility for LTD benefits, Prudential found that Epolito was "employed as a Manager with Kemper Auto & Home Insurance Company since February 7, 1977." A.R. at 67. Because of this finding, Prudential did not analyze whether Epolito's disability should be excluded from

coverage as a pre-existing condition. Id. at 66-68. Indeed, had Prudential applied Epolito's interpretation of "Employer" at that time, it is unclear whether Epolito would have been eligible for coverage under the terms of the Plan at all. The Plan states that "the date you are eligible for coverage is the later of: the plan's program date; and the day after you complete your employment waiting period." A.R. at 8. The "employment waiting period" is defined as "the first of the month following date of hire." Id. at 4. The Plan's program date is January 1, 2003, and pursuant to Epolito's definition of Employer, her date of hire was also January 1, 2003. Id. at 4; Epolito Affidavit, Ex. D. Thus, it appears her eligible date of coverage would have been February 1, 2003. However, Epolito's last day of work due to her disability was January 31, 2003. A.R. at 347. Nevertheless, even if Epolito had not been excluded from coverage altogether, it is likely that her disability would have been excluded as a pre-existing condition. However, Prudential did not consider either potentially disqualifying factor based on its interpretation of the term "Employer." Thus, although applying Epolito's interpretation of "Employer" would have been beneficial to Prudential in the evaluation of Epolito's initial claim in that it might have avoided liability for benefits altogether, Prudential applied a definition of "Employer" that included Kemper Auto & Home, regardless of its parent company, and thus considered Epolito's date of hire to be February 7, 1977. Its uniform construction of the term suggests that Prudential's interpretation was not arbitrary and capricious.

Moreover, Prudential's interpretation of the term "Employer" is reasonable given Epolito's own representations regarding the entity that constituted her "Employer." The Employment History Form instructed Epolito to "describe each job worked within the past 15

years" and to list different jobs with the same employer separately. See A.R. at 179. Epolito stated that she worked for Kemper Auto and Home from June 2002 to February 2003 as a "Customer Service Billing Mgr." Id. Therefore, Epolito's own version of her Employment History does not reflect a change of employer or new employment on January 1, 2003. Id. From April 2002 to June 2002 Epolito again listed her employer as Kemper Auto and Home and stated that she "handled transition for operations dept [sic] due to sale of company," id. at 179-80, and from June 1983 to April 2002 she stated that she worked as a "Regional Operations Mgr" for an employer named "Kemper Insurance/ Kemper A & H." Id. at 180. Accordingly, her self-reported employment history reflects her understanding that her "Employer" was consistently Kemper Auto and Home. Additionally, Epolito's employer also submitted statements that are in keeping with Prudential's interpretation of the term "Employer." Id. at 347. On the Employer Statement Form, a representative of Epolito's employer listed the Employer's name as "Kemper Auto and Home" and stated that Epolito was hired by the employer on February 7, 1977. Id. Given that the Employment History and the Employer Statement Forms demonstrate that both Epolito and her employer understood her "Employer" to be Kemper Auto and Home, regardless of its parent company, the Court does not view Prudential's consistent interpretation of that term to be unreasonable.

The parties do not present any information or argument pertaining to any "concerns about unexpected costs and [Prudential's] future financial stability." See Cagle, 112 F.3d at 1519; see generally Epolito's Motion and Prudential's Response. As such, this factor does not weigh one way or the other in the Court's determination. Significantly, although it is Epolito's burden to show that Prudential's determination was arbitrary and capricious, she

has presented no evidence that Prudential's decision was made in bad faith, or that its interpretation of the term "Employer" would be inconsistent with any other provision in the Plan.  As such, review of these factors does not persuade the Court that Prudential's decision was arbitrary and capricious.

Finally, the Court must consider "whether [Prudential's] conflict of interest tainted its decision, thereby rendering its otherwise reasonable decision unreasonable." White, 542 F.3d at 1360.  As explained above, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Id.; see supra Part III.B. Epolito has not pointed to, nor can this Court discern, any evidence that Prudential was influenced by the conflict.  Epolito's contention that "[n]o reasonable person could agree that Unitrin/Kemper Independence is the same entity as Kemper," is undermined by Epolito's own statements on the Employment History Form which reveal that she consistently understood her Employer to be "Kemper Auto and Home," regardless of its parent company.  Compare Epolito's Motion at 15 with A.R. at 179-80. Moreover, the Court is not persuaded by Epolito's argument that Prudential "miscontsru[ed] its own policy terms for its own benefit." Epolito's Motion at 15.  Applying Epolito's definition would have better served Prudential's financial interest given that under her definition, Epolito's disability may have constituted a pre-existing condition, allowing Prudential to deny her the LTD benefits altogether, rather than merely reducing the amount of her benefits. See supra at 19-20.  Accordingly, the Court finds that Epolito has not met her burden in demonstrating that Prudential's determination was tainted by its conflict of interest.  In light of the foregoing, the Court finds, even accounting for the conflict, that Prudential did not

abuse its discretion in determining that Epolito's LTD benefits should be offset by her pension benefit.  As such, Epolito's Motion is due to be denied, and Prudential's Motion is due to be granted to the extent it seeks judgment in Prudential's favor on Epolito's claim.

## III.   Restitution Counterclaim

### A.      Summary of the Arguments[7]

In Prudential's Motion, Prudential seeks summary judgment on its counterclaim for restitution.  Prudential argues that pursuant to 29 U.S.C. § 1132(a)(3) it is entitled to restitution and recovery of the portion of the LTD benefits Epolito received from August 2, 2003, until August 31, 2005, that exceeded the amount to which she was entitled.  See Prudential's Motion at 10-13.  In Epolito's Response, Epolito argues that Prudential can not recover the "alleged overpayment" because it "has not offered any proof that Epolito remains in possession of the funds it allegedly seeks to lien" and thus, Prudential can not make a claim for equitable relief because it has not shown that the funds are actually in the possession of the person being sued.  See Epolito's Response at 5-8.  In addition, Epolito maintains that with respect to her SSD benefits, 42 U.S.C. § 407 bars Prudential from imposing any type of equitable assignment or constructive trust over the social security payments she has received or will be receiving in the future.  Id. at 8.  Epolito adds that even social security monies held in an unsegregated bank account are protected by § 407(a), thereby preventing Prudential's recovery of these monies.  Id. at 10-11.  In its Reply, Prudential argues that because it is asserting an equitable lien by agreement, it is not

---

[7]         The Court will not recite the arguments that are rendered moot by the Court's determination in Part III that Prudential may properly apply an offset for Epolito's pension benefits.

required to trace the particular funds at issue.  <u>See</u> Prudential's Reply at 3-4.   Thus, Prudential maintains that it can recover the overpayment even if the funds are no longer in Epolito's possession.  <u>Id.</u>  Lastly, Prudential contends that 42 U.S.C. § 407(a) is not applicable to this action because it is not seeking a lien on Epolito's SSD benefits, but rather on the overpaid LTD benefits.  <u>Id.</u> at 4-5.

**B.     Applicable Summary Judgment Standard**

Pursuant to Rule 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  <u>See Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Rule 56 permits the moving party to discharge this burden with or without supporting affidavits.  <u>See</u> Rule 56(a), (b).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (internal citation and quotations omitted). In addition, the dispute must have a "real basis in the record" in order to constitute a genuine dispute of fact. Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002) (quoting Mize, 93 F.3d at 742) (internal quotations omitted). Thus, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005). Nevertheless, in determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994) (per curiam)).

## C.    Discussion

A fiduciary may bring a civil action under ERISA "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The parties do not dispute that Prudential is a fiduciary and that it is seeking to enforce the terms of the LTD Plan. Nevertheless, Epolito contends that Prudential's claim for restitution is not "appropriate equitable relief" under the statute because it has not shown that Epolito "is in possession of any specific funds or that any funds previously received have not been spent." See Epolito's

Response at 7.  In response, Prudential argues that it is seeking an "equitable lien by agreement" and thus strict tracing rules do not apply.  As such, Prudential contends that because it can identify a particular share (the amount of benefits Epolito received above what she was entitled to), of a specifically identified fund (the LTD benefits paid to Epolito), it is entitled to summary judgment on its claim for restitution.

The term "equitable relief" in § 1132(a)(3) includes "those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)."  Mertens v. Hewitt Assocs., 508 U.S. 248, 255-59 (1993).  Although Prudential brings an action for restitution, "not all relief falling under the rubric of restitution is available in equity."  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002).  The Supreme Court first addressed this distinction in the Knudson case. In Knudson, a woman who had been injured in a car accident received medical benefits from her husband's health and welfare plan.  Knudson, 534 U.S. at 207.  The woman later settled a tort claim arising out the accident, and her portion of the settlement was paid directly into a special needs trust.  Id. at 207-08.  Pursuant to the benefit plan, the insurer sought full reimbursement from the settlement funds, and when the woman refused, it sued her under ERISA to enforce the plan, seeking, inter alia, restitution, which the insurer characterized as equitable relief.  Id. at 208, 212.  The Knudson Court explained that "whether [restitution] is legal or equitable depends on 'the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought."  Id. at 213 (first alteration added).  As such, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  Id.

at 214.   In contrast, "[i]n cases in which the plaintiff 'could <u>not</u> assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him,' the plaintiff had a right to restitution <u>at</u> <u>law</u> . . . ." <u>Id.</u> at 213.   Thus, in <u>Knudson</u>, because the funds to which the insurer claimed an entitlement were not in the woman's possession, the Supreme Court found that the insurer's claim was for legal, rather than equitable, relief and therefore unavailable under ERISA.   <u>Id.</u> at 214.

The Supreme Court again addressed the relationship between restitution and equity in <u>Sereboff v. Mid Atlantic Medical Servs., Inc.</u>, 547 U.S. 356 (2006).   In <u>Sereboff</u>, an ERISA plan paid medical benefits to the Sereboffs who were injured in a car accident.   <u>Sereboff</u>, 547 U.S. at 360.   After the Sereboffs settled a tort suit arising out of the car accident, their insurer sought reimbursement, pursuant to the benefit plan, for the medical expenses it had paid on their behalf.   When the Sereboffs refused, the insurer filed suit under ERISA and, by stipulation, the parties agreed to preserve in an investment account a portion of the settlement proceeds equal to the amount the insurer had paid in medical benefits until the lawsuit was resolved.   <u>Id.</u>   Upon review, the Supreme Court first examined the nature of the relief sought by the insurer.   In doing so, the Court distinguished the facts of <u>Sereboff</u> from <u>Knudson</u> on the basis that the

> impediment to characterizing the relief in <u>Knudson</u> as equitable is not present here. . . . [I]n this case [the insurer] sought 'specifically identifiable' funds that were 'within the possession and control of the Sereboffs' -that portion of the tort settlement due [the insurer] under the terms of the ERISA plan, set aside and 'preserved [in the Sereboffs'] investment accounts.'

Id. at 362-63 (first and second alteration added).  As such, the Court concluded that the insurer's claim "does not falter because of the nature of the recovery it seeks."  Id. at 363. Next, the Court considered whether the basis of the insurer's claim was equitable.  Relying on Barnes v. Alexander, 232 U.S. 117 (1914), the Supreme Court found that the insurer was seeking to enforce an "equitable lien 'by agreement.'"  Sereboff, 547 U.S. at 363-65.  Thus, because the insurer was seeking equitable relief, the Court held that the insurer's claim was permitted under ERISA.  Sereboff, 547 U.S. at 369.

In light of the foregoing authority, Prudential contends that its claim is also based on an "equitable lien by agreement" entitling it to relief under Sereboff.  Significantly, Prudential argues that under Sereboff, "strict tracing rules" do not apply to equitable liens by agreement, and therefore, it is not required to "trace" the overpaid LTD benefits to a particular fund or asset in Epolito's possession.  See Prudential's Motion at 12-13; Prudential's Reply at 3-4. Indeed, relying on language in Sereboff stating that an insurer is not required to "'trace the asset into its products or substitutes,' or 'trace [its] money or property to some particular funds or assets,'" see Sereboff, 547 U.S. at 364-65, Prudential argues that it is entitled to relief even without establishing that the funds it seeks are still in Epolito's possession.  See Prudential's Reply at 4.  Although the Eleventh Circuit has not yet addressed this issue, a number of other courts have interpreted Sereboff in a manner consistent with Prudential's contention.  See Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 231 (1st Cir. 2010) (affirming a district court's granting of summary judgment on an insurer's counterclaim for recovery of overpaid benefits even though the insurer had not identified "a specific account in which the funds [were] kept or proven that they [were] still in [the beneficiary's]

possession" (alterations added)); Gutta v. Standard Select Trust Ins. Plans, 530 F.3d 614, 621 (7th Cir. 2008) ("[The insurer] may bring its counterclaim under 29 U.S.C. § 1132(a)(3) even if the benefits it paid [the insured] are not specifically traceable to [the insured's] current assets because of commingling or dissipation." (alterations added)); Gilchrest v. Unum Life Ins. Co. of Am., 255 F. App'x 38, 44-45 (6th Cir. 2007) (unpublished) (finding that "[the insured's] undisputed averment that the overpayments have been dissipated would seem to be of no avail," because Sereboff "clarified that to establish an equitable lien by agreement, strict tracing of funds is not required and the fund need not have been in existence when the contract was executed" (alteration added)); see also DeBenedictis v. Hartford Life & Accident Ins. Co., 701 F. Supp. 2d 1113, 1134 (D. Ariz. 2010) ("The fact that plaintiff commingled the LTD benefits he was overpaid with his other assets does not defeat defendant's counterclaim."). However, upon review of Sereboff and the related Eleventh Circuit precedent, this Court is not convinced that Sereboff's holding eliminates the requirement that the insurer identify an intact, identifiable res, in the possession of the insured, on which it seeks to impose the equitable lien.

Reviewed in context, this Court does not read Sereboff's holding with respect to tracing as broadly as the authorities cited above. Prudential is correct insofar as the Supreme Court did find that "strict tracing rules" do not apply to equitable liens by agreement. Sereboff, 547 U.S. at 364. However, the Sereboff Court was not considering tracing in the context of the imposition of an equitable lien over a fund that may have been dissipated since its identification. See Sereboff, 547 U.S. at 360-63. The Court discussed tracing in response to the insured's argument that the insurer's "suit would not have satisfied

the conditions for 'equitable restitution' at common law, particularly the 'strict tracing rules' that allegedly accompanied this form of relief." Id. at 364.  Because the funds the insurer sought to recover were preserved due to a pre-trial stipulation, the insured's argument was not that the fund had been dissipated since its identification and therefore could not be traced.  Rather, the insured's tracing argument was that because the insurer had not originally possessed the asset it sought to recover (the settlement fund), it could not trace the asset from its own possession to that of the insured as required to impose an equitable lien.  See id. at 364.  The Supreme Court rejected the "tracing requirement of the sort asserted by the [insured]," based on its reading of Barnes v. Alexander, 232 U.S. 117 (1914). Id. at 364-65 (alteration added).  The Court noted that in Barnes, although the plaintiffs "could not identify an asset they originally possessed, which was improperly acquired and converted into property the defendant held," they were nevertheless able to secure an equitable lien by agreement.  Sereboff, 547 U.S. at 365.  Accordingly, the Court made the limited finding that "[t]o the extent [the insurer's] action is proper under Barnes, therefore, its asserted inability to satisfy the 'strict tracing rules' for 'equitable restitution' is of no consequence."  Id. at 365.  As such, this Court does not find that the Supreme Court's holding in Sereboff addresses the impact that dissipation of the identified fund would have on an insured's ability to impose an equitable lien by agreement.  See Admin. Comm. for the Wal-Mart Stores, Inc. Assocs' Health & Welfare Plan v. Horton (Wal-Mart Stores), 513 F.3d 1223, 1227 n.3 (11th Cir. 2008) (explaining that the holding in Sereboff with respect to tracing means that "although the disputed funds had never actually been in possession of the plan, the plan could seek to 'recover' property that belonged to it in good conscience

under the plan agreement"); <u>see also</u> <u>Herman v. Metro. Life Ins. Co.</u>, 689 F. Supp. 2d 1316,

1317-18 (M.D. Fla. 2010); <u>Popowski v. Parrott</u>, No. 1:04-CV-0889-JOF, 2008 WL 4372006,

at *7 (N.D. Ga. Sept. 19, 2008); <u>Unum Life Ins. Co. of Am. v. Wolf</u>, No. 07-cv-00071-REB-

KLM, 2008 WL 2185889, at *5 (D. Colo. May 23, 2008); <u>Unum Life Ins. Co. of Am. v. Epes</u>,

___ F. Supp. 2d ___, 2010 WL 1729707, at *5-8 (E.D. Ark. Apr. 27, 2010).[8]

Moreover, the Supreme Court in <u>Knudson</u> instructed that "where 'the property [sought

to be recovered] or its proceeds have been dissipated so that no product remains, [the

plaintiff's] claim is only that of a general creditor,' and the plaintiff 'cannot enforce a

constructive trust of or an equitable lien upon other property of the [defendant].'" <u>Knudson</u>,

534 U.S. at 213-14 (quoting Restatement of Restitution § 215, Comment a, at 867 (1936)).

Nothing in <u>Sereboff</u> overruled this holding, nor did it alter the <u>Knudson</u> Court's finding that

"for restitution to lie in equity, the action generally must seek not to impose personal liability

on the defendant, but to restore to the plaintiff particular funds or property <u>in the defendant's

possession</u>," <u>Knudson</u>, 534 U.S. at 214 (emphasis added).  <u>See</u> <u>Sereboff</u>, 547 U.S. at 362-

67.  Additionally, the Eleventh Circuit, although it has not addressed the specific issue before

---

[8]    The Court recognizes that in <u>Popowski v. Parrott</u>, 461 F.3d 1367 (11th Cir. 2006), the
Eleventh Circuit briefly addressed the impact of <u>Sereboff</u> on tracing requirements.  In <u>Popowski</u>, the
Eleventh Circuit noted that "the fact that the third-party recovery triggering the [ERISA] Plan's
reimbursement provision was comingled [sic], even absent tracing, would not have disqualified an
equitable lien had that equitable lien been <u>by agreement</u> . . . ."  <u>Popowski</u>, 461 F.3d at 1374 n.8.
However, because the Court  determined that the insurer failed to meet the requirements for equitable
relief on other grounds, it did "not reach any issue of tracing" in that case.  Accordingly, the
aforementioned statement is merely dicta and not binding on this Court. <u>See</u> <u>Black v. United States</u>, 373
F.3d 1140, 1144 (11th Cir. 2004) (defining dictum as "a statement that neither constitutes the holding of
a case, nor arises from a part of the opinion that is necessary to the holding of the case") (citations
omitted); <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring)
("[D]icta in our opinions is not binding on anyone for any purpose.").  In light of the Eleventh Circuit's
subsequent decision in <u>Wal-Mart Stores</u> discussing the <u>Sereboff</u> holding and emphasizing the importance
of an intact, identifiable <u>res</u>, the Court does not find the <u>Popowski</u> dicta to be persuasive and will not
follow it here.  <u>See</u> <u>Wal-Mart Stores</u>, 513 F.3d at 1227 n.3, 1229.

this Court, has instructed that "[u]nder <u>Knudson</u>, <u>Sereboff</u>, and the other authorities [cited in <u>Wal-Mart Stores</u>], the most important consideration is . . . that the settlement proceeds are <u>still</u> <u>intact</u>, and thus constitute an identifiable <u>res</u> that can be restored to its rightful recipient." <u>Wal-Mart Stores</u>, 513 F.3d at 1229 (emphasis added).  As such, in order to succeed in its claim for equitable relief, Prudential must identify a specific, intact, fund, <u>in</u> <u>Epolito's</u> <u>possession</u>, belonging in good conscience to Prudential.  <u>See</u> <u>Knudson</u>, 534 U.S. at 213 ("[A] plaintiff could seek restitution <u>in</u> <u>equity</u>, ordinarily in the form of . . . an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."); <u>Herman</u>, 689 F. Supp. 2d at 1330-31 ("As there is no evidence . . . of the existence of an identifiable fund in [the insured's] possession as to which [the insurer] can bring a claim under Section 1132(a)(3), [the insurer's] motion for summary judgment should be denied as to its reimbursement counterclaim.").

It is undisputed that Prudential paid LTD benefits to Epolito for the period spanning from August 2, 2003 through August 31, 2005.  Because Epolito received a retroactive award of SSD benefits covering that period, and because Prudential did not offset Epolito's pension benefits during that time, Epolito received LTD benefits in excess of the amount to which she was entitled.  Moreover, the terms of the Plan and the Reimbursement Agreement authorize Prudential to recover any such overpayments.  However, Prudential has not submitted any evidence that those overpaid benefits still remain in Epolito's possession such that the Court

could impose an equitable lien on those particular funds.[9] See generally Prudential's Motion. Although, Prudential notes that Epolito has not provided "any conclusive evidence that the funds are indeed no longer in her possession," it is Prudential's burden to establish that its claim is for equitable relief, and to do so it must show, not only that Epolito "once had property legally or equitably belonging to [Prudential], but that [she] still holds the property or property which is in whole or in part its product." Restatement of Restitution § 215 cmt. a (1936). In the absence of such an identified fund, Prudential's "claim is only that of a general creditor." Knudson, 534 U.S. at 213 (quoting Restatement of Restitution § 215 cmt. a (1936)). Because Prudential has not submitted any evidence that the LTD benefits paid to Epolito remain in her possession, Prudential has not demonstrated that it is entitled to equitable relief under § 1132(a)(3)(B). Accordingly, Prudential's Motion for Summary Judgment is due to be denied to the extent it seeks judgment on Prudential's reimbursement counterclaim. Nevertheless, Prudential may be able to recoup the overpayment of benefits through applying Epolito's ongoing LTD benefit payments to the amount of the outstanding overpayment. See White, 542 F.3d at 858-59.

---

[9]   To the extent Prudential seeks to recover the overpaid benefits resulting from Epolito's receipt of retroactive SSD benefits by imposing an equitable lien on the SSD benefits themselves, such a claim is barred by 42 U.S.C. § 407(a). See 42 U.S.C. § 407(a); Ross v. Penn. Mfrs Ass'n Ins. Co., No. Civ.A. 1:05-0561, 2006 WL 1390446, at *8 (S.D. W. Va. May 22, 2006). However, the Court recognizes that 42 U.S.C. § 407(a) is not applicable to this matter insofar as Prudential seeks to impose the equitable lien, not on the SSD benefits, but on the overpaid long term disability benefits. See Fregeau v. Life Ins. Co. of N. Am., 490 F. Supp. 2d 928, 931-32 (N.D. Ill. 2007); Bosin v. Liberty Life Assurance Co. of Bos., No. 1:06-cv-186, 2007 WL 1101187, at *10-11 (W.D. Mich. April 11, 2007). Nevertheless, Prudential's Motion fails because Prudential has not established that those overpaid long term disability benefits remain in Epolito's possession.

**IV.    Attorneys' Fees**

The Court notes that the parties have requested reasonable attorneys' fees and costs related to this action in their respective Motions.  See Epolito's Motion at 16; Prudential's Motion at 18-19.  In an ERISA action "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  However, the Court will not rule upon these requests unless and until the parties file an appropriate motion, in accordance with Rule 54(d)(2), after the entry of final judgment in this action.  Any such motion should include a discussion of the five factors set forth in Freeman v. Continental Ins. Co., 996 F.2d 1116, 1119 (11th Cir. 1993) for determining the appropriateness of awarding attorneys' fees in an ERISA action.

In light of the foregoing it is

**ORDERED**:

1.    Plaintiff's Dispositive Motion for Summary Judgment with Incorporated Statement of Undisputed Facts and Memorandum of Law in Support (Doc. No. 25) is **DENIED**.

2.    Defendant/Counterclaimant's Motion for Summary Judgment and Memorandum of Law in Support (Doc. No. 26) is **GRANTED, in part, and DENIED, in part**.

   A.    Prudential's Motion is **GRANTED** to the extent it seeks summary judgment in Prudential's favor on Epolito's claim for benefits.

   B.    In all other respects, Prudential's Motion is **DENIED**.

C.       Entry of final judgment is deferred until after the resolution of Prudential's Counterclaim.

3.       In light of the procedural posture of this case, the Court directs the parties to participate in either a settlement conference before a United States Magistrate Judge or a second mediation conference.

A.       On or before **September 15, 2010**, the parties shall either advise the Court of the date of their second mediation conference or of their agreement to attend a settlement conference before a Magistrate Judge.

B.       In the event the parties fail to resolve the remaining claim at the mediation or settlement conference, within **five (5) days** of its conclusion, the parties shall file a notice advising the Court as to the manner in which they intend to proceed.

**DONE AND ORDERED** at Jacksonville, Florida on September 2, 2010.

*Marcia Morales Howard*

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record